Good morning. I'm Elana Rubel on behalf of Plaintiff Appellant Mr. Emanuel Agyeman. With me is Anjali Kumar, my colleague, and we will be splitting our time this morning. I will be addressing the issues surrounding the court's denial of the appointment of counsel, and Ms. Kumar will be addressing the dismissal of Defendant Lopez for failure to serve. So I'd appreciate it if you could direct your questions accordingly so we can allocate our time. I'd like to begin with the right of access. Now, there's no doubt in this circuit or anywhere in the United States under the Bounds case that prisoners must have a right of access to courts. Now, the Ninth Circuit has found that that right can be satisfied either by access to an adequate law library or by access to legal assistance. Now, that's been set forth in the Leeds v. Watson case as well as the Storseth v. Spellman case cited in the papers. Now here, plaintiff had neither. He had no attorney and he had no meaningful access to a law library. What he had in punitive segregation is he had the ability to name a case. If he knew precisely what he wanted, the name of the case or the number of the statute, he could tell the law library and they would provide it to him. But that was all he had. And I think that really doesn't count as meaningful access to a law library. I'm a trained lawyer and there is no way that I could conduct a case under such circumstances or do any meaningful legal research. Now, the Ninth Circuit has specifically addressed the due process concerns raised by this very system, by the Arizona prison's policies regarding inmates in lockdown, that condition that Mr. Agerman was in, whereby he's in punitive segregation with this very limited access. And the Ninth Circuit has acknowledged in the opinion of Lewis v. Casey that prisoners, that inmates in lockdown are routinely denied access to a law library. Now, in the Lewis v. Casey case, the Ninth Circuit tried to address this with a systemic overhaul, but the U.S. Supreme Court struck that down and said that such a broad systemic overhaul wasn't merited. But they did uphold the fundamental constitutional right of access to the courts. And the Supreme Court in Lewis v. Casey did find that on an individual basis, it was still appropriate to find that where the individual was specifically harmed by the denial of access to a lawyer or access to a law library, that it was appropriate to intervene and appoint counsel or guarantee them meaningful access to a law library. Now, in this case, I think there's little doubt that there was actual harm that resulted from the denial of access to these legal resources. From the beginning through the end, this harm was pervasive. It took Mr. Agerman two years just to get a complaint that was acceptable to the court. He had to file innumerable motions and amendments to his complaint. In the course of this process, he had four of his counts dismissed. Three of the defendants were dismissed. And then from then on out, up through trial, the impairment of his case was evident. He was unable to investigate or assert core due process concerns arising from his unique status as a civil detainee. Now, counsel for Appellee has tried to assert as some sort of conclusive proof that, in fact, he didn't need a lawyer, this proliferation of pleadings. Now, we contend that it's exactly the opposite. The reason there was a proliferation of pleadings is evidence of his failure to understand and navigate the system. The fact that he had to file five motions and six amended complaints is not a sign that he was a prison Perry Mason, as the CCA would have you believe. It is evidence of precisely the opposite, that he was fumbling desperately through the system. And I think if Your Honors would review the papers and the transcripts, it will become evident that, in fact, he was not the legal expert that CCA has tried to paint him out to be by any stretch. Now, the CCA has cited various cases for the proposition that a counsel is not guaranteed or it's not a fundamental right in the Ninth Circuit for a civil indigent litigant. Now, the cases they've cited, Rand v. Rowland, Aldabi v. Aldabi, Storseth and Terrell, they were all cases in which the plaintiff had just lodged a generalized complaint that they would have been better off with a lawyer. Now, none of the cases cited involved the deprivation of access to a law library. None of them addressed the deprivation of core access, which is really at issue here. Nor did any of the cases involve a civil detainee, which I think is a very significant distinction. All of the cases that they rely upon were prisoners. Now, I'd like to get back to the point that I think it's very significant that he was a civil detainee. This is a distinction that's been recognized both by the U.S. Supreme Court in Bell v. Wolfish and in several cases within the Ninth Circuit in Pierce v. Multnomah County and Redmond v. San Diego. Now, all of these cases have acknowledged that there's a different level of protection. There's a Fourteenth Amendment level of protection as opposed to the Eighth Amendment protection for prisoners. Eighth Amendment protection, of course, merely pertains to protection against cruel and unusual punishment, whereas the Fourteenth Amendment says there can be no punishment and no excessive force that amounts to punishment for civil detainees. Now, if — How does that relate to the right of counsel, though, appointed counsel? Well, it seems — I mean, that's a condition that's obviously — those cases didn't concern this issue. Sure. Well, it seems that he should be at least entitled to the level of protection that a prisoner should get. And, you know, my colleague and I have affectionately referred to our client in the course of this case as Joseph K. from the great classic. Because his circumstances are so astonishing. For seven years, having never been charged with a crime, never been accused of anything, civil detainee charged with a visa violation, he has been locked up in solitary and punitive segregation in leg irons and chains, allowed to shower three times a week in the very same facility as murderers and rapists. And he, in fact, has less legal protection than that which is afforded to murderers and rapists. And that cannot be what the system anticipates. Now, of course, we're not here about the fact of his incarceration and detention, but I think it does get to the issue of appointment of counsel, because the circumstances of his ordeal, I think, are intricately linked. They are — the prison officials where he is have been permitted to retaliate with impunity. They have been allowed to basically put him away for seven years, the bulk of his time, in punitive segregation, in complete confidence that because he is so deprived of access to legal resources, they need never fear legal redress. They can basically, with these nebulous charges of insolence, they can put him away indefinitely, where he has no access to a law library, no access to a lawyer, English is his second language, you know, he has no legal training, and basically he has no way to fight back. Assuming RAND applies, though, how do you address RAND versus Roland and the standards that we set in that case? Well, I think — well, first of all, as I mentioned — well, I guess you said assuming it applies. I think it's quite distinguishable in that we have a civil DCA on that. Right. Assuming it applies. Well, assuming it applies, I think that the DCA is wrong in saying — in confining the two-factor test as compared to the broader factor test embraced by other circuits. Now, the factor that they fasten on is the one where it says that it has to be complex. Well, in fact, the factor in RAND is a little bit more than that. In RAND — sorry — the factor says that it's the ability of the petitioner to articulate his claims in light of the complexity that's at issue. And RAND, in fact, and then Terrell and the other Ninth Circuit cases, they cite with approval the broader test embraced by the Fifth Circuit and the Second Circuit and the Seventh Circuit, which say that it's appropriate to take into account in assessing that ability things like whether the plaintiff has the ability to explore the facts, whether the plaintiff has the ability to present the facts, their ability to investigate, that sort of thing, the impediments to such abilities. And I think even under RAND, it's entirely appropriate to examine those things, and I think those factors weigh very heavily in favor of appointment of counsel here. And if I might elaborate more on that point, I think under the RAND standard, this is an extraordinary case, and this is exactly the kind of case where appointment of counsel would be warranted. He had — the plaintiff had tremendous impediments to his ability to investigate facts. He couldn't conduct depositions. He couldn't conduct fact discovery. Every time he moved facilities, all of his hard-won legal research and papers disappeared. Now, CCA, his point, had pointed out that there was never a finding that they were at fault in that, but the fact is these things happen, and at the end of the day, he was left with no legal papers. Can I ask you — I don't want this — you're the person to ask, or you're a co-counsel, but it seems to me one of his biggest handicaps was who he would have to call as witnesses. Right. Now, if he had gotten Lopez or Cannon, they were very hostile people. How would they have helped him at all? Now, if you think that should go to co-counsel, you can put it off. But if it's in your domain — It does primarily relate to my co-counsel's domain, but I'll make a quick attempt to answer it. I think he felt that Cannon was not particularly hostile. She had ruled in favor — Well, she'd sent him away a couple of times. Right. I mean, she was — I can't imagine that she would have been a friendly witness. Well, our client felt that there were certain inconsistencies in the story that could have been established and fleshed out had he had an opportunity to conduct discovery. And really, at core, there were credibility issues here. He says he was attacked. Prison guards say they didn't attack him. But he would have had two people saying, you attacked us, or you attacked the prison guards. Well, I hate to get into matters off the record. I mean, he felt that there were inconsistencies regarding where bites were located, whether there were bites, that sort of thing. And he felt that had he had an opportunity to cross-examine and depose, that perhaps he could have established some inconsistencies and, you know, generally better fleshed out his case and cast some doubt on the evidence presented against him. You used about half your time up. Do you want to save some for your colleague? Yes, I would. I'd like to just ask one question. This isn't a 1983 action, is it? No, it's a civil action for a right. It's for retaliation and for assault. But is this not a Bivens claim? Pardon me? Is this not a Bivens claim rather than a 1983? 1983 relates to the conduct of state officials. Bivens applies to federal. Oh, right. Well, these are actually private employees through the corporation. But they're federal. But they are federal through their contracting arrangement. Okay. Right. And I believe he, well, that was one of the issues in the course of the dismissal of his many claims, various claims where I think he had a failure to properly assert his claims by his failure to understand what he had to do exactly. But just in closing, I'd like to direct your attention to the Merritt case, which is a Seventh Circuit case, where they noted that when the rights of a constitutional dimension are at stake, a poor person's access to the federal courts must not be turned into an exercise in futility, which is precisely what happened here. And to avoid it being an exercise in futility, the only solution really was to have given him meaningful access, which required representation by a lawyer. Thank you. Thanks, counsel. May it please the Court. I'm Anjali Kumar. And to address Your Honor's question regarding defendants or officers Lopez and Cannon, while they might seem hostile from the record given, they would have been at least able to shed some doubt on the testimony that did actually come into the record, the testimonies of the officers who were there. Lopez was a shift supervisor. He would have had a little more objectivity with regards to Mr. Ajiman's position and wouldn't necessarily have been mired in the sort of hate and retaliation that Lieutenants Gerber and Valadez and Lawrence perhaps would have. And he feels pretty strongly about the fact that if he was able to at least do some discovery, at least figure out what Captain Lopez really did see during the October 11th incident and what Sarah Cannon knew about some of the actions that occurred around his punitive segregation, that he might have had a better chance at trial, at least been able to question the credibility of the officers that the defendant was able to put up there. To address specifically the dismissal of Captain Lopez, he was dismissed in the summer of 2002 based on a failure to perfect service. And there are many cases in both this circuit and other circuits which actually say that an incarcerated indigent prisoner plaintiff only needs to rely on the U.S. marshal in order to perfect service. And that if they are reasonably diligent in giving the marshal the necessary information, then it's up to the marshal to actually find that defendant. The defendants tried to claim that Mr. Ajiman was not diligent, claiming that he didn't provide enough evidence and this gap of time in which he wasn't persisting and calling the court, perhaps calling the marshal, is evidence to the fact that he wasn't diligent and doesn't deserve to have the marshals look for him. In fact, Mr. Ajiman did more than any of the plaintiffs in defendant-cited cases did to try to locate Captain Lopez. He found an address himself and gave it to the U.S. marshal. On the actual subpoena form, he noted, this person used to be employed by CCA. Please ask CCA if there is other information. When that was returned unexecuted, he filed another motion using – filed another request for service using another address provided by defendants' counsel. Again, it came back unexecuted. Really, from his position, as my co-counsel mentioned, in punitive segregation, he doesn't have the ability to go out and run a public search on where Captain Lopez might be located. He relies on the U.S. marshal to do their diligent best to locate this defendant. In fact, when the court asked for an order to show cause why this defendant was not The court refused, saying that Mr. Ajiman shouldn't be allowed a fishing expedition. However, as the cases, both White v. SKF 768 FSUP 498 and Rochon v. Dawson 828 F2D 1107, both state that there is a security interest in not opening up files of garbage   But, as an alternative, they say to open up these files to the marshal themselves. Jones v. Jones Bay, which – Jones Bay v. Wright, a northern district of Indiana case, 876 FSUP 195, actually lays out factors which a marshal must go through. And appellee counsel tries to claim that because the marshal did, in fact, use the address that Mr. Ajiman gave them, the marshal had no duty other than that. The marshal did not have to be diligent. But, in fact, what Jones Bay tells us is that the marshal can go to the Department of Corrections. The marshal can go to the former employer and get those records under seal, so that we don't need to worry about a security concern. Mr. Ajiman doesn't have to be claimed to be going on a fishing expedition. The marshal himself can deal directly with the Department of Corrections, find out the address of this never-served defendant, and actually perfect the service, because the marshal is Mr. Ajiman's only reliable source in the outside world. And the cases that defendants cite actually speak to that. Those plaintiffs, some of them didn't even mention the defendant's name, just let the marshal do their – expected the marshal to do their job. Others never followed up after one address was returned unexecuted. Mr. Ajiman actually followed up twice, plus his response to the order to show cause. So, in fact, there was reasonable diligence here, and there was good cause to extend the time for service. And perhaps if service had been made on Captain Lopez, we would have been able to at least poke some holes in the testimony given at trial. Well, he was a defendant, so the opportunity to get a judgment against him was lost. Is that not true? It is, Your Honor. This is a friendly question. Yes, he was, and that was somewhat prejudicial. And we wish that he could have been there so that he could – so that Captain Lopez, not only a judgment could have been rendered against him, but his testimony could have been utilized as well. Thank you. Thank you, counsel. Do you want to save some time for rebuttal? Yes. Okay. May it please the Court. My name is Daniel Strzok, and I represent Appalese, Valadez, Gerber, and Moritz on this appeal. Just a couple of background things I need to fill the Court in on, because when we're talking about here. There were actually two claims related to two different facilities. All of my clients are employees of Corrections Corporation of America, which is a private prison which contracts with, at the time, with the INS to house detainees. Mr. Aguiman was actually – had been picked up in Las Vegas for filing – or for being deported and was fighting those deportation proceedings when he was incarcerated at the two CCA facilities. He primarily spent his time at the Eloy Detention Center, which was where the claim relating to the retaliation arose. For a very short period of time, he was housed in the Central Arizona Detention Center in Florence, which is only about 20 miles from Eloy. That is where the excessive force claim arose. In terms of the defendants, Officer or Lieutenant Gerber relates to the excessive force claim. Officer Valadez and Fred Lawrence, who is the Chief of Security at Eloy, relate to the due process claims. Your Honor is correct. This is a claim that should be analyzed under Bivens. However, the case law is essentially the same. But isn't that – I know you made a point of that, but doesn't it point out that he didn't have the right legal theory? So it was a complex case. It actually is really not that complex of a case. It was an excessive force case and a due process case. No, but to know that it's a Bivens and not a 1983, that's an important start. But that's actually something that wasn't ever really caught throughout this. Right. By the judge, by the court either. But the case law is the same, so it doesn't really make any difference. The only difference here is – But I'm not sure that's true. The case law is the same when you're analyzing his rights as a detainee under the Constitution. The case law is the same. However, as a Federal – as a Federal detainee, he needs to bring it under Bivens as opposed to 1983. Right. So he brought it under the wrong thing. And it seems to me that's a fundamental mistake at the beginning, which he might have been thrown out. He might have been up here feet one saying you need to reverse it because he had the wrong theory. I think you would have been, but – Well, what would have happened if we would have filed a motion to dismiss is the Court would have dismissed it with prejudice and allowed him to refile under Bivens. So it really – Well, let me ask you a question, if you don't mind my asking you a question or two. He's not, at the time, charged with a crime or convicted of a crime, correct? Excuse me? He was – he was – yes, he was charged with a crime and he was convicted of a crime. Actually, three crimes. At the time he's being held by you? Yes, sir. He was charged with passing bogus checks in Washoe County, Nevada, which he pled no contest to and was incarcerated as a result of that. But he wasn't serving his incarceration. He was not serving his incarceration. While he was incarcerated with us, the INS was in the process of trying to deport him as a result of those convictions. Corrections Corporation of America did not hold him as a Federal prisoner. Is that correct? Yes. He is being held as a Federal detainee. Detainee. Yes. Answer the question. I asked as a prisoner. I'm sorry. He was not a prisoner. I absolutely agree. Now, your brief – There's no doubt that he is a detainee. He's not a prisoner. You know, you give me very little chance to ask you a question. You're very anxious to reply, but you – wait for the question, would you? Yes, sir. Your brief says that on the transfer to a hospital in the course of a heart attack, that he was in restraints as required by policy. Now, what is that policy that required restraints when you're having a heart attack? Your Honor, there isn't a prison in the country that will transport anyone in any kind of medical distress to an outside hospital or medical facility outside of restraints. That's simply bad correctional practice, and you will never – I think, counsel, the answer – the question was what was the policy, not what other –  Throughout the United States. Outside of the facility is to be transported in restraints, whether it's a medical issue or not. You have – can you cite that policy? I don't have – Will you furnish it? I can certainly furnish – Please do that. I can certainly furnish the policy. You cite that as though policy was some higher administrative officer. Policy required it. I'd like to know what policy did require transfer to a hospital of a man having a heart attack in restraints of this character. Now, you know, it's conceivable that nobody would go without handcuffs, but these were heavy restraints, and I want to see how the policy required it. Do you understand? Well – Do you understand that question? I understand your question, Your Honor. And will you supply the policy that required it? Well, I will supply the policy for you. Thank you. They were not heavy restraints. They were standard restraints that are used. The allegation is that they were on his chest. Well, the testimony from all of the witnesses but the plaintiff, and that was Nurse Golden, who was no longer an employee of C.C.A. at the time. She testified at trial. Officer Dubois and Lieutenant Gerber all stated that this – he kept talking about some sort of chain across his chest. There was no chain across his chest. He was transported in a belly chain, handcuffs and leg irons. Well, these two of them are employees of Correxus Corporation of America, are they not? At the time of the incident, they were all employees of C.C.A. That is correct. All right. So I'd like to see the policy. And I'll be happy to provide that to you. Now, Mr. Aguiman is not your typical pro se plaintiff. He is an articulate man. What is a typical pro se? Well, typical pro se. We see a lot of them. And I see a lot of them because I represent C.C.A. and also Maricopa County and the state of Arizona. Typically, they are of average intelligence. They're not college educated. Most of them can read and write and understand English. The reason why I say Mr. Aguiman is not typical is because he says that he has two master's degrees in political science and economics from the London School of Economics, which in my view would make him not the typical detainee. But that does not make him a lawyer, does it? No, it doesn't. It does not make him a lawyer. But it does make him able to articulate his claims, which he did in this case. He was able to actually get by summary judgment on two of the claims and make it to trial and did a fair job at trial in trying to articulate his claims to the jury. Wasn't it true that a substantial part of his amended complaint was dismissed by the court? Yes, it was. And wasn't it true that your client was dismissed? And C.C.A. should have been dismissed because... Well, how do we know? Well, as a Federal claimant, they have no claim against Corrections Corporation of America pursuant to the Malesko v. C.S.C. Supreme Court case. A Federal inmate cannot sue the private contractor. They can sue the employees of the private contractor, but under the Malesko case, it is appropriate for C.C.A. not to be a defendant in the action. But it's clear that he drafted a very defective complaint, getting the long cause of action stated and making a mistake on a number of the counts that he pled. And Mr. Agumon has, again, he was able to get two of the claims to a jury. But is that the test? Well, in this case, I think you look at it. The test is can you articulate your claims? And he did. At least he lost a lot of them in the course of trying to articulate them. And Mr. Agumon spends a lot of time. Mr. Agumon is a frequent filer of lawsuits. He spends a lot of time filing his lawsuits. But in this case, he got it to trial, which I think shows that he was able to articulate the two main claims that he had. He got something to trial. Excuse me? He got something to trial. Yes, he did. Many of the claims that were dismissed were against individual defendants relating to these two allegations that he did get to trial. Did you think he had the skills, really, to conduct the trial? He had a between the judge assisting him and the judge asking us to assist him and his own intelligence, yes, he did. But he did fine in trial. Did you try the case? Yes, I did. You have to admit, though, that he would have gotten proper service on a defendant if he'd had a lawyer. I don't know that he would have, and I'll tell you why. You don't think a lawyer could have found that person? My office didn't find him, and we were looking for him. That maybe shows a little lack of imagination on your firm's part. Well, perhaps it does. But also you have to also look at the fact that in 2004 they were able to get an address. We still don't know whether that's the right address on Lopez. But you can't say that using the technology or that same search engine, whether you could have found him in 2000 and 2001 when the marshals were trying to find him. No one can say that. Well, they were trying to find him, except at the address indicated by the plaintiff, right? I mean, they didn't go searching for him. No, what they did was they paid for a service using his Social Security number to find him. That's a service that is accuant that every year they upgrade their technology, upgrade their software. What I'm saying is we don't know whether even using that same service, whether they could have found him in 2000 and 2001. I mean, we're just speculating. Sure, but being a lawyer who is not incarcerated would have improved his chances. It certainly would have improved his chances. But, again, I asked my paralegal to find him and she couldn't find him. So all I'm saying is that we don't know whether anyone would have found him in 2000 and 2001. We do know that the marshal did not go back and get into his employment records. Is that accurate? No, that is accurate. They did not go back and look at his employment records. What they did, though, was take our human resources director, provided the marshals with the last known address that was in the file. I had his file. That was the address that we had. And the marshals did what they needed to do, and that was follow up with the addresses that they had, one that Mr. Ragimai gave them and one that we gave them. And when the marshals couldn't find him, they had satisfied their due diligence. What counsel here is asking you to do is to force the marshals or to have marshals in every case where they need to find or where a witness is to be found, if they can't find him initially, they need to employ a paid-for search engine to try and find him. And we don't know what kind of search engine it is. That's just a standard that nowhere in the country has a court required that, and this Court shouldn't either. The marshals did what they had to do. They did they were diligent in trying to find him. They looked for the they used the addresses that they had. And that's really all that they should have to do. They shouldn't have to expend additional money to try and go out and find people. That would not be the precedent that this Court should set. I'd like to go back to the amount of force that was used on him in the transfer. Is it your position that there's no distinction between someone being held as a civil detainee and a prisoner? No, that's not my distinction, and the Court took care of that in the instruction. There's no the malicious intent portion of the typical Eighth Amendment excessive force instruction was taken out, which is appropriate in a detainee situation. Well, what is the defense for using any force on a civil detainee? Well, here's the defense. In this case, Mr. Aguiman lunged at Lieutenant Gerber. No, no. Excuse me. He said he didn't want any restraint or this restraint. So what is the justification for the restraint that had been employed? Because he was going to be transported outside of the facility, and the Federal Government requires any time we transport a Federal detainee outside of the facility that they be in restraint. So when he appeared in court, was he under restraint? He was in restraints during the transport, and then I believe my recollection, the judge had him taken out of restraints when he was sitting in the courtroom, but there were three marshals in the courtroom the whole time. And does the Federal Government specify the restraints? Yes. So you've got to supply them. And I will supply them, I promise. So every day he comes in shackled, and then he's unshackled so he can try the case for whatever period of time with three marshals behind him, and then at the end of the day he's shackled again, right? That's right. Did he behave himself during trial? That's my recollection. He did behave himself during trial. Did the jurors see the shackling or the unshackling? I'm sorry? Did the jurors? No, no. That was all done outside of the viewing of the jury. They could see the marshals, but they didn't. Sure. They knew he was detained by the Federal Government. They knew he was a detainee. He was wearing an orange jumpsuit, and it was clear that, I mean, that was part of his claim, and they knew he was a detainee and they knew why he was there. In terms of the ---- If he'd had a lawyer, he probably wouldn't have been in the orange jumpsuit, would he? Well, I don't know about that, I suppose. Of course he wouldn't have been. Well, at the beginning of the trial, he asked the judge, apparently he had some clothes that he wanted, some street clothes that he wanted to wear, and the judge said, that's fine with me, just bring your street clothes, and then he never did. But had he had a lawyer, that would have been all arranged beforehand. Wouldn't you have rather tried a case against a lawyer? I mean, trying a case against a pro se is hard. Your Honor, I just don't want to try this case again. I understand. This is a case where the jury came up with a right. They came up with the right decision. All of the evidence in the case, including the admissions that were made by Mr. Aguiman, were that he was fighting with the officers, he refused to go in restraints, and he admitted that he struggled and fought, and he admitted that he bit one or more of the officers. I think the problem, though, is getting back to fundamentals. We started off with Rand and talking about whether or not this petitioner was, well, plaintiff was sophisticated. And I'm not sure the test is if you're educated. I don't know if the test is if you're a smart person or not. But I think in some cases, if you're talking about the claims are sophisticated enough to get to trial, I think the trial judge ought to look seriously at getting him counsel if he asks for it, because of all the problems you're talking about. You wouldn't have to worry about him testifying. You wouldn't have to worry about taking him into court and confined or not. You may have worried about your own safety in the court room. You wouldn't have to do that. I disagree with Your Honor's statement. What you're saying, then, is any time a prosecutor ---- I didn't say anything. I'm just saying that that's part of the calculus. But that should maybe be an additional factor in the court's ruling. You're saying if he's got a master's degree, he's sophisticated enough that he doesn't, as a matter of law, need a lawyer. That's kind of what you're saying. That's basically what you're saying. Well, I'm saying that he was able to articulate his claims in court, and he was. He was able to do that. The court, even at the end of the case, when jury instructions were prepared, the court told Mr. Aguiman what a wonderful job he'd done preparing the jury instructions. He had no problem filing pleadings and asking for discovery, citing the appropriate case law. He did just fine. Except it was tried under a completely erroneous theory, 1983 as opposed to ---- I know you say there's no meaningful distinction, but, you know, there is. I mean, it's the completely wrong theory for the case. Well, there is no ---- I say there is no meaningful distinction because the case law that you interpret under is the same. When you're looking at the excessive force claim and the due process claim, that's ---- and that's what the judge instructed the jury on. And the jury ---- How could we have upheld a judgment against your clients under 1983? Well, what you would have argued on appeal is that it was weighed. Well, I understand that. I'm just saying, how could we have upheld a judgment against your clients under 1983? I did not have. I think you would have said there was a waiver. A waiver? Waiver. That you then consented to be held liable for something you couldn't possibly be liable for? Well, that would be ridiculous. No. No, we haven't had to do that. I have a feeling that's what would have happened. Maybe I'm wrong. Well, maybe I'm wrong. But in this case, I need to address a couple of things, because I only have a few seconds here. Sarah Cannon was not a helpful witness to him. He never asked that he could call Sarah Cannon. And if he had, the judge would have said, Mr. Strutt, get Sarah Cannon here. But she was not favorable. In fact, she was a defendant in the lawsuit originally. I don't know how she could be his ally. Second. Well, before that, I understand that he's basically saying an ally. But generally speaking, you want, even for impeachment purposes, you want the key players there on the other side, even if it's just for a hostile cross-examination. And she could have been there. All he had to do was ask. I decided not to call Sarah Cannon because her testimony was duplicative of what Todd Moen testified to. Sarah Cannon was a disciplinary officer, and her ‑‑ she related to the due process claim. And we were trying to get the case done. The judge wanted to have it done within four days. And because everything she had to say was duplicative of what Todd Moen said, I decided not to call her. If Mr. Ogilvie was given the opportunity, if he had said, Judge, I want to have them bring Sarah Cannon here, the judge would have made us do it. And he never asked. You can't say it's an abuse of discretion when he didn't ask for it. So how did he know that the judge would have forced you to bring him? Well, because he had us bring Ms. Golden, who was not even our employee anymore. We had to subpoena her for the trial. He had us bring Mr. Dubois, who was not even a party to the case, because Mr. Ogilvie wanted to ask questions of these folks. You had a second point you wanted to make. And my second point was in regards to Captain Lopez. We know what Captain Lopez would have said, because we have two reports that were prepared by him. And in no way were they favorable to the plaintiff's case. They were admitted. And, in fact, were consistent with what all the other witnesses said, that Aguiman was combative, that he actually bit Lopez and broke the skin. Lopez filed a police report in the Florence Police Department against him because of his concerns about the fact that he was bit in the thumb and his concerns about communicable diseases. Lopez was no friend and was completely consistent with what all the other testimony was in the case. Is Mr. Aguiman still under detention? It's my understanding that he is in Pinel County Jail as a result of an assault on an officer at this time. His removal proceedings haven't proceeded? I don't know what the status of those are. Any further questions? Thank you, counsel. I suspect I have a little time for rebuttals, so I'll jump around on various issues. Well, just to address the most recent point, the fact that Mr. Lopez might have been hostile to Aguiman does not necessarily mean that his introduction of testimony wouldn't have improved Mr. Aguiman's case. It's clear that the plaintiff was very unpopular amongst the prison personnel at these facilities, and, frankly, establishing the bias and animus would have been core to the credibility issues that would have enabled him to establish his case. And one of the things he firmly believes is that he was hated by these guards, and that was one of the reasons they retaliated and that they attacked him. And that could have come out had he been there. And the fact that he was hostile I don't think necessarily cuts against the plaintiff. I'd like to also address the sort of pervasive ---- But you already testified about the hostility. I mean, your client testified about the hostility. That was his theory. So, I mean, it's difficult. Any ---- No. Go ahead. Right. But I think his point was never that he was going to get Mr. Lopez to say that the plaintiff was a great guy. I think it was more that he was going to establish inconsistencies and establish that he was hated and there was a, you know, a motive perhaps for all of this. Again, there's this pervasive theory coming out that the fact that there was a trial means that there was a fair trial. And, really, nothing could be further from the truth. If you take the time to review the transcript, it's really painful. I mean, I was clutching my head in many parts. He made no opening statements. He made no evidentiary objections. There was no effective cross-examination. There were missing witnesses, as you know, due to his misunderstanding of the process and what he had to do to get a witness on the list. He was vilified. I mean, really, reading the transcript, you would think that Mr. Agyeman was the one on trial. The tables were completely turned. He was under attack through the entire course of the trial. And notwithstanding any encouraging remarks that the judge may have made to try and buck up his spirits, I think it was really not the case that he had a fair and full opportunity to present his side. With respect to asking for a basic Internet search, I really don't think that these are Herculean efforts that are called for here. We were able to find this information in less than five minutes. It's the sort of search that we all conduct, you know, ten times a day if we're looking for a restaurant or a hairdresser. And in the modern world with technology, it's really the least that we can ask for, particularly given the extremely constrained circumstances of the plaintiff here. He can't do anything. He can't make a phone call. He can't look at the Internet. He can't look at a phone book. He can't do anything. And really asking for a five-minute Internet search doesn't seem like something that will cause the engines of the correctional system to come to a halt. Just another issue. I don't believe that the plaintiff did admit to biting. I think he said at one point that Lopez's finger ended up in his mouth, but he specifically said that he never did bite. So I think that was just a factual inaccuracy there. It's pretty close to a bite. Well, he was, I think, in the course of him being thrown down and his teeth being banged into the ground. But if there are no further questions, I'd like to thank you. Thank you for your time. The case assert will be submitted. Mr. Schreck, you'll provide three copies of the policy and a copy to counsel, but within five days. Thank you. We'll proceed to the next case on the oral argument calendar, which is Air Conditioning Refrigeration Institute versus Energy.
judges: B. Fletcher, Noonan, Thomas